1    **PHILLIP A. AUSTIN ABN**
2    215 North Robson Street
     Mesa, Arizona 85201
     Telephone: (480) 644-0506
3    Fax: (480) 644-9256
     Email: attyaustin@gmail.com
4    **Counsel for Plaintiffs**

5    **RICHARD M. MARTINEZ ABN 7763**
     P.O. Box 43250
6    Tucson, Arizona 85733-3250
     (520) 609-6324
7    richard@richardmartinezlaw.com
     **Counsel for Plaintiffs**

8

9         **UNITED STATES DISTRICT COURT**

10        **FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Xavier DaVon Juniel, a single man; Davyon Duhart, a single man; Daunte Boudy, a single man; Robert Diablo Jordan, a single man; Stevie Ray Maddox, a single man; Darius Ahmed Glover, a single man; Jerone Davison, a single man; Gerald Wilbon, a single man; Andre Adams, a single man; Arrick Dowe, a single man; Malik Clark, a single man~~;~~; Martin Nivens, a single man, | No. **2:18-cv-04957** |
| Plaintiffs | **FIRST AMENDED** COMPLAINT |
| vs. | (Action for Declaratory and Injunctive Relief) |
| Maricopa County Community College District, a political subdivision of the State of Arizona; Maricopa County Community College District Governing Board, a public entity of the State of Arizona; Laurin Hendrix, in his official capacity as Board Member of the Maricopa County Community College District; Dana G. Saar, in his official capacity as Board Member of the Maricopa County Community College District; Johanna Haver, in her official capacity as Board Member of the Maricopa County Community College District;; Jean McGrath, in her official capacity as Board Member of the Maricopa County Community College District; Augustine Bartning, in his official capacity as Board Member of the Maricopa County Community College District; Tracy | |

Livingston, in her official capacity as )
Board Member of the Maricopa County )
Community College District; Dr. Linda )
Thor, in her official capacity as Board )
Member of the Maricopa County )
Community College District; and Dr. )
Maria Harper-Marinick, in her official )
capacity as Chancellor of the Maricopa )
County Community College District, )
                                       )
                    Defendants.        )
_____)

Plaintiffs, by and through counsel undersigned, for their complaint against allege as follows:

## I.   JURISDICTION.

1.    The United States District Court has original jurisdiction over this matter pursuant to 28 USC §§ 1331. This action arises under the Constitutions of the United States of America, Title 42 United States Code Section 1983, and Title 42 United States Code Section 2000d.

## II.   VENUE.

2.    Venue is proper in the United States District Court for the District of Arizona under 28 U.S.C. 1391(b). This Court has personal jurisdiction over the Defendants in this matter as they are all residents of the District of Arizona, the underlying acts of this complaint took place in the District of Arizona, and all of the Plaintiffs reside in the District of Arizona.

## III.   PARTIES.

### A.   Plaintiffs.

3.    Plaintiff, Xavier DaVon Juniel ("Plaintiff Juniel"), is an African-American, a citizen of the United States, and a resident of the State of Arizona presently residing in Maricopa County. Plaintiff Juniel  graduated from Brophy College Preparatory in Phoenix, Arizona in May 2018. In addition to excelling academically, Plaintiff Juniel also was an outstanding athlete at Brophy College Preparatory and accepted a scholarship to play football at Mesa Community College ("MCC") in Mesa, Arizona

during the 2018-2019 academic year. Plaintiff Juniel presently is enrolled at MCC and played football on the MCC football team during the 2018 Fall Semester.

4.     Plaintiff, Davyon Duhart ("Plaintiff Duhart"), is an African-American, a citizen of the United States, and a resident of the State of Arizona presently residing in Maricopa County. Plaintiff Duhart graduated from Tolleson Union High School in Tolleson, Arizona in May 2018. In addition to excelling academically, Plaintiff Duhart was an outstanding athlete at Tolleson High School and accepted a scholarship to play football at Phoenix College ("PC") in Phoenix, Arizona during the 2018-2019 academic year. Plaintiff Duhart presently is enrolled at MCC and played football on the PC football team during the 2018 Fall Semester.

5.     Plaintiff, Daunte Boudy ("Plaintiff Boudy"), is an African-American, a citizen of the United States, and a resident of the State of Arizona presently residing in Maricopa County. Plaintiff Boudy graduated from Cienega High School in Vail, Arizona in May 2018. In addition to excelling academically, Plaintiff Boudy was an outstanding athlete at Cienega High School and accepted a scholarship to play football at Scottsdale Community College ("SCC") in Scottsdale, Arizona during the 2018-2019 academic year. Plaintiff Boudy presently is enrolled at SCC and played football on the SCC football team during the 2018 Fall Semester.

6.     Plaintiff, Robert Diablo Jordan ("Plaintiff Jordan"), is an African-American, a citizen of the United States, and a resident of the State of Arizona presently residing in Maricopa County. Plaintiff Jordan graduated from Mesquite High School in Gilbert, Arizona in May 2018. Plaintiff Jordan was an outstanding athlete at Mesquite High School and participated in football, basketball, baseball, and track. Plaintiff Jordan accepted a scholarship to play football at MCC in Mesa, Arizona during the 2018-2019 academic year. Plaintiff Jordan presently is enrolled at MCC and played football on the SCC football team during the 2018 Fall Semester.

7.     Plaintiff, Stevie Ray Maddox ("Plaintiff Maddox"), is an African-American, a citizen of the United States, and a resident of the State of Arizona presently

residing in Maricopa County. Plaintiff Maddox graduated from Tempe High School in Tempe, Arizona in May 2018. Plaintiff Maddox was an outstanding athlete at Tempe High School and participated in football, wrestling, and track. Plaintiff Maddox accepted a scholarship to play football at MCC in Mesa, Arizona during the 2018-2019 academic year. Plaintiff Maddox presently is enrolled at MCC and played football on the MCC football team during the 2018 Fall Semester.

8.      Plaintiff, Darius Ahmed Glover ("Plaintiff Glover"), is an African-American, a citizen of the United States, and a resident of the State of Arizona presently residing in Maricopa County. Plaintiff Glover graduated from Skyline High School in Mesa, Arizona in May 2018. Plaintiff Glover was an outstanding athlete at Skyline High School and participated in football, basketball, and track. Plaintiff Glover accepted a scholarship to play football at MCC in Mesa, Arizona during the 2018-2019 academic year. Plaintiff Glover presently is enrolled at MCC and played football on the MCC football team during the 2018 Fall Semester.

9.      Plaintiff, Jerone Davison ("Plaintiff Davison"), is an African-American, a citizen of the United States, and a resident of the State of Arizona presently residing in Maricopa County. Plaintiff Davison graduated from McClintock High School in Tempe, Arizona in May 2018. Plaintiff Davison was an outstanding athlete at McClintock High School where he participated in football. Plaintiff Davison accepted a scholarship to play football at MCC in Mesa, Arizona during the 2018-2019 academic year. Plaintiff Davison presently is enrolled at MCC and played football on the MCC football team during the 2018 Fall Semester.

10.     Plaintiff, Gerald Wilbon ("Plaintiff Wilbon"), is an African-American, a citizen of the United States, and a resident of the State of Arizona presently residing in Maricopa County. Plaintiff Wilbon graduated from Red Mountain High School in Mesa, Arizona in May 2018. Plaintiff Wilbon was an outstanding athlete at Red Mountain High School and participated in football, basketball, and track. Plaintiff Wilbon accepted a scholarship to play football at MCC in Mesa, Arizona during the 2018-2019 academic

1   year. Plaintiff Wilbon presently is enrolled at MCC and played football on the MCC
2   football team during the 2018 Fall Semester.

3       11.     Plaintiff, Andre Adams ("Plaintiff Adams"), is an African-American, a
4   citizen of the United States, and a resident of the State of Arizona presently residing in
5   Maricopa County. Plaintiff Adams graduated from Mountain Pointe High School in
6   Phoenix, Arizona in May 2018. Plaintiff Adams was an outstanding athlete at Mountain
7   Pointe High School and participated in football, basketball, and track. Plaintiff Adams
8   accepted a scholarship to play football at PC in Phoenix, Arizona during the 2018-2019
9   academic year. Plaintiff Adams presently is enrolled at PC and played football on the PC
10  football team during the 2018 Fall Semester.

11      12.     Plaintiff, Arrick Dowe ("Plaintiff Dowe"), is an African-American, a
12  citizen of the United States, and a resident of the State of Arizona presently residing in
13  Maricopa County. Plaintiff Dowe graduated from Sunrise Mountain High School in
14  Peoria, Arizona in May 2018. Plaintiff Dowe was an outstanding athlete at Sunrise
15  Mountain High School where he participated in football. Plaintiff Dowe accepted a
16  scholarship to play football at SCC in Scottsdale, Arizona during the 2018-2019
17  academic year. Plaintiff Dowe presently is enrolled at SCC and played football on the
18  SCC football team during the 2018 Fall Semester.

19      13.     Plaintiff, Malik Clark ("Plaintiff Clark"), is an African-American, a citizen
20  of the United States, and a resident of the State of Arizona presently residing in Maricopa
21  County. Plaintiff Clark graduated from Moon Valley High School in Peoria, Arizona in
22  May 2018. Plaintiff Clark was an outstanding athlete at Moon Valley High School where
23  he participated in football. Plaintiff Clark accepted a scholarship to play football at GCC
24  in Glendale, Arizona during the 2018-2019 academic year. Plaintiff Clark presently is
25  enrolled at GCC and played football on the GCC football team during the 2018 Fall
26  Semester.

27  ///
28  ///

1   ///

2   ///

3   14. Plaintiff, Martin Nivens ("Plaintiff Nivens"), is an African-American, a citizen of the United States, and a resident of the State of Arizona presently residing in Maricopa County. Plaintiff Nivens graduated from Thunderbird High School in Phoenix, Arizona in May 2018. Plaintiff Nivens was an outstanding athlete at Thunderbird High School where he participated in football, basketball, and track. Plaintiff Nivens accepted a scholarship play football at PC in Phoenix, Arizona during the 2018-2019 academic year. Plaintiff Nivens presently is enrolled at PC and played football on the PC football team during the 2018 Fall Semester.

  **B.** **Defendants.**

   15. Defendant, Maricopa County Community College District ("MCCCD"), which was established in 1962 under the provisions of legislation enacted by the Arizona State Legislature in 1960. The MCCCD is a "political subdivision" of the State of Arizona as defined in A.R.S. § 38-431(5) and, therefore, a "public entity" within the meaning of A.R.S. § 12-820(7).

   16. Defendant, Maricopa County Community College District Governing Board ("MCCCD Board"), is a "board" of a "political subdivision" within the meaning of A.R.S. § 38-101(1) and, therefore, a "public entity" within the meaning of A.R.S. § 12-820(7).

   17. Defendant, Laurin Hendrix ("Defendant Hendrix"), is a member of the MCCCD Board and presently serving as its President and is sued in his official capacity as a member of the MCCCD Board.

   18. Defendant, Dana G. Saar ("Defendant Saar"), is a member of the MCCCD Board and is sued in his official capacity as a member of the MCCCD Board.

   19. Defendant, Johanna Haver ("Defendant Haver"), is a member of the MCCCD Board and is sued in her official capacity as a member of the MCCCD Board.

20.    Defendant, Jean McGrath ("Defendant McGrath"), is a member of the MCCCD Board and is sued in her official capacity as a member of the MCCCD Board.

21.    Defendant, Augustine Bartning ("Defendant Bartning"), is a member of the MCCCD Board and is sued in his official capacity as a member of the MCCCD Board.

22.    Defendant, Tracy Livingston ("Defendant Livingston"), is a member of the MCCCD Board and is sued in her official capacity as a member of the MCCCD Board.

23.    Defendant, Linda Thor ("Defendant Thor "), is a member of the MCCCD Board and is sued in her official capacity as a member of the MCCCD Board.

24.    Defendant, Dr. Maria Harper-Marinick ("Defendant Harper-Marinick"), is the current Chancellor of the MCCCD and serves as its chief executive officer and, therefore, a public employee of a public entity within the meaning of A.R.S. § 12-820(6). Defendant Harper-Marinick is sued in her official capacity as Chancellor of the MCCCD.

## IV.    PLAINTIFFS' ACTION

25.    This is an action seeking equitable relief against the action undertaken by Defendant Harper-Marinick in her capacity as Chancellor of Defendant MCCCD to eliminate all football programs existing in various schools of the MCCCD, including PC, MCC, SCC, as well as Glendale Community College ("GCC"), because enforcement of Defendant Harper-Marinick's decision would violate Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution and denies African-American equal protection and due process.

26.    Plaintiffs assert this action pursuant to the Civil Rights Act of 1871, Title 42 United States Code Section 1983, the Civil Rights Act of 1964, Title 42 United States Code 2000d, and the Declaratory Judgment Act of 1934, Title 28 United States Code Section 2201.

## V.    FACTUAL ALLEGATIONS

A.    **Plaintiffs Decisions to Accept Scholarships from MCCCD Schools.**

27. Plaintiffs Juniel, Duhart, Boudy, Jordan, Maddox, Glover, Davison, Wilbon, Adams, Dowe, ~~and~~ Clark, and Nivens all belong to a protected class, African-American.

28. Plaintiffs Juniel, Duhart, Boudy, Jordan, Maddox, Glover, Davison, Wilbon, Adams, Dowe, ~~and~~ Clark, and Nivens all accepted scholarships to play football at MCCCD colleges for various reasons, including without limitation, the hope of further their education, providing them an opportunity to improve their football playing ability with the hope of receiving a scholarship to a four-year university as follows:

29. Plaintiff Juniel:

a. Plaintiff Juniel graduated from Brophy College Preparatory ("Brophy") in Phoenix, Arizona in May 2018 with a GPA of 3.0 and is interested in studying law.

b. Plaintiff Juniel played wide receiver on the Brophy football team all four years he was in high school

c. Plaintiff Juniel was accepted to all three state public universities, *i.e.*, the University of Arizona ("UA"), Arizona State University ("ASU"), and Northern Arizona University ("NAU").

d. Plaintiff Juniel also was accepted to Louisiana State University ("LSU") in Baton Rouge, Louisiana.

e. Plaintiff Juniel also was recruited to play football at various out-of-state NAIA schools or Division II and Division III schools and offered academic packages to attend the same.

f. Plaintiff Juniel elected to play at MCC because financially he could not afford to go out-of-state or the UA, ASU, or NAU.

g. Plaintiff Juniel committed to play at MCC on signing day, February 7, 2018, even though the announcement re elimination of football programs at MCCCD colleges was made on February 5, 2018.

h.     Plaintiff Juniel declined other offers because of belief that he would be able to play two (2) years at MCC.

i.     Elimination of the football programs at MCCCD colleges just two (2) days prior to signing day left him without opportunity to accept financial packages or offers from other schools.

j.     The offers from the other schools had been withdraw based on Plaintiff Juniel advising of his intent to attend MCC.

k.     Plaintiff Juniel believed that playing football at MCC would have provided him with an opportunity to further develop as a player with the hope of being recruited to a Division I school or other 4-year university.

l.     Plaintiff Juniel viewed his football-playing ability as means of further his education; unfortunately, he now is uncertain about his future education as his family is of modest means and will not be in a position to assist him financially.

m.     Plaintiff Juniel believes that elimination of football programs by MCCDD will impact him financially in the future because he will not have the opportunity to play the second year and further develop as a player with the hope of being recruited to a Division I school or other 4-year university.

30.     Plaintiff Duhart:

a.     Plaintiff Duhart graduated from Tolleson Union High School  in Tolleson, Arizona, in May 2018 with a GPA of 3.87 but presently is undecided in his major area of study.

b.     Plaintiff Duhart was a running back and defensive back all 4 years at Tolleson.

c.     Plaintiff Duhart was accepted to all in-state universities, *i.e.*, UA, ASU, NAU.

d.     Plaintiff Duhart also received interest from a number of Division II and III schools.

e.     Plaintiff Duhart elected to play at PC because financially he could not afford to go out-of-state or the UA, ASU, or NAU.

f.     Plaintiff Duhart committed to play at PC on signing day, February 7, 2018, even though the announcement of the elimination of football programs at MCCCD colleges was made on February 5, 2018.

g.     Elimination of the football programs at MCCCD colleges just two (2) days prior to signing day left Plaintiff Duhart without opportunity to accept financial packages or offers from other schools.

h.     The offers from the other schools had been withdraw based on Plaintiff Duhart advising of his intent to attend PC.

i.     Plaintiff Duhart believes he will be negatively impacted because elimination of football programs by MCCCD will not allow him to show Division I schools his abilities as football player and, therefore, he may not be recruited.

j.     Plaintiff Duhart viewed football provides him opportunity to take his prerequisite coursework done as he will not have a scholarship for the second year.

k.     Elimination of football will negatively impact Plaintiff Duhart financially as it will be more difficult to complete his college studies.

l.     Plaintiff Duhart also believes that elimination of football programs by MCCCD  also will negatively impact his growth as person and ability to develop character through coaching and friends on team.

m.     Plaintiff Duhart also believes that elimination of football programs by MCCDD will impact him financially in the future.

31.   Plaintiff Boudy:

a.     Plaintiff Boudy graduated from Cienega High School in Tucson, Arizona in May 2018.

b.     Plaintiff Boudy played football all four (4) years as defensive end and center on offense.

c.      Plaintiff Boudy was named 2nd Team All Region on defense and Honorable Mention on offense.

d.      Plaintiff Boudy accepted a scholarship and committed to playing football at SCC prior to announcement on February 5, 2017 of the elimination of football programs at MCCCD on February 5, 2018.

e.      Plaintiff Boudy had offers from Pima Community College in Tucson, Arizona, PC and Rocky Mountain College in Billings, Montana, as well as an academic scholarship offer Ottawa University in Surprise, Arizona.

///

f.      Plaintiff Boudy declined the offers from Rocky Mountain College and Ottawa University offers due to finances.

g.      Plaintiff Boudy's life-long dream has been to play football for a Division I university and wanted to use his junior college experience to improve his skills in hope of being recruited by Division I school.

h.      Plaintiff Boudy believes that football provides guidance, mentorship, structure, comradeship, *etc.*, all of which serve provide maturity and personal growth.

i.      Plaintiff Boudy now is left with the dilemma of being unable to play football after this year, which may leave him financially unable to pursue a four-year degree.

j.      Plaintiff Boudy believes that elimination of football programs by MCCDD will impact him financially in the future.

32.     Plaintiff Jordan:

a.      Plaintiff Jordan graduated from Mesquite High School  in Gilbert, Arizona, in May 2018.

b.      Plaintiff Jordan played football all four years at Mesquite High School and was selected All-Region his sophomore and junior years.

1        c.     Plaintiff Jordan accepted a scholarship to and committed to playing

2   football at MCC prior to announcement on February 5, 2017 of the elimination of

3   football programs at MCCCD on February 5, 2018.

4        d.     Plaintiff Jordan believes that football provides guidance,

5   mentorship, structure, comradeship, *etc.*, all of which serve provide maturity and

6   personal growth.

7        e.     Plaintiff Jordan now is left with the dilemma of being unable to play

8   football after this year, which may leave him financially unable to pursue a four-year

9   degree.

10        f.     Plaintiff Jordan believes that elimination of football programs by

11   MCCDD will impact him financially in the future.

12   ///

13       33.    Plaintiff Maddox:

14        a.     Plaintiff Maddox graduated from Tempe High School  in Tempe,

15   Arizona, in May 2018.

16        b.     Plaintiff Maddox played football all four years at Tempe High

17   School and was selected MVP of both his football and wrestling teams.

18        c.     Plaintiff Maddox accepted a scholarship to and committed to

19   playing football at MCC prior to announcement on February 5, 2017 of the elimination

20   of football programs at MCCCD on February 5, 2018.

21        d.     Plaintiff Maddox believes that football provides guidance,

22   mentorship, structure, comradeship, *etc.*, all of which serve provide maturity and

23   personal growth.

24        e.     Plaintiff Maddox now is left with the dilemma of being unable to

25   play football after this year, which may leave him financially unable to pursue a four-

26   year degree.

27        f.     Plaintiff Maddox believes that elimination of football programs by

28   MCCDD will impact him financially in the future.

34.   Plaintiff Glover:

a.   Plaintiff Glover graduated from Skyline High School in Mesa, Arizona, in May 2018.

b.   Plaintiff Glover played football all four years at Skyline High School and was selected player of the year.

c.   Plaintiff Glover accepted a scholarship to and committed to playing football at MCC prior to announcement on February 5, 2017 of the elimination of football programs at MCCCD on February 5, 2018.

d.   Plaintiff Glover believes that football provides guidance, mentorship, structure, comradeship, *etc.*, all of which serve provide maturity and personal growth.

///

///

e.   Plaintiff Glover now is left with the dilemma of being unable to play football after this year, which may leave him financially unable to pursue a four-year degree.

f.   Plaintiff Glover believes that elimination of football programs by MCCDD will impact him financially in the future.

35.   Plaintiff Davison:

a.   Plaintiff Davison graduated from McClintock High School in Tempe, Arizona, in May 2018.

b.   Plaintiff Davison played football all four years at McClintock High School.

c.   Plaintiff Davison accepted a scholarship to and committed to playing football at MCC prior to announcement on February 5, 2017 of the elimination of football programs at MCCCD on February 5, 2018.

d.   Plaintiff Davison believes that football provides guidance, mentorship, structure, comradeship, *etc.*, all of which serve provide maturity and personal growth.

e.   Plaintiff Davison now is left with the dilemma of being unable to play football after this year, which may leave him financially unable to pursue a four-year degree.

f.   Plaintiff Davison believes that elimination of football programs by MCCDD will impact him financially in the future.

36.   Plaintiff Wilbon:

a.   Plaintiff Wilbon graduated from Red Mountain High School  in Mesa, Arizona, in May 2018.

b.   Plaintiff Wilbon played football all four years at Red Mountain High School and was selected first team All Division defensive back and second team All Division wide receiver.

///

c.   Plaintiff Wilbon accepted a scholarship to and committed to playing football at MCC prior to announcement on February 5, 2017 of the elimination of football programs at MCCCD on February 5, 2018.

d.   Plaintiff Wilbon believes that football provides guidance, mentorship, structure, comradeship, *etc.*, all of which serve provide maturity and personal growth.

e.   Plaintiff Wilbon now is left with the dilemma of being unable to play football after this year, which may leave him financially unable to pursue a four-year degree.

f.   Plaintiff Wilbon believes that elimination of football programs by MCCDD will impact him financially in the future.

37.   Plaintiff Adams:

1        a.     Plaintiff Adams graduated from Mountain Pointe High School  in

2 Phoenix, Arizona, in May 2018.

3        b.     Plaintiff Adams played football all four years at Mountain Pointe

4 High School.

5        c.     Plaintiff Adams accepted a scholarship to and committed to playing

6 football at PC prior to announcement on February 5, 2017 of the elimination of football

7 programs at MCCCD on February 5, 2018.

8        d.     Plaintiff Adams believes that football provides guidance,

9 mentorship, structure, comradeship, *etc.*, all of which serve provide maturity and

10 personal growth.

11       e.     Plaintiff Adams now is left with the dilemma of being unable to

12 play football after this year, which may leave him financially unable to pursue a four-

13 year degree.

14       f.     Plaintiff Adams believes that elimination of football programs by

15 MCCDD will impact him financially in the future.

16 ///

17 ///

18    38.    Plaintiff Dowe:

19        a.     Plaintiff Dowe graduated from Sunrise Mountain High School in

20 Peoria, Arizona, in May 2018.

21        b.     Plaintiff Dowe played football all four years at Sunrise Mountain

22 High School and was twice selected to the All-State Team as a cornerback.

23        c.     Plaintiff Dowe accepted a scholarship to and committed to playing

24 football at SCC prior to announcement on February 5, 2017 of the elimination of football

25 programs at MCCCD on February 5, 2018.

26        d.     Plaintiff Dowe believes that football provides guidance, mentorship,

27 structure, comradeship, *etc.*, all of which serve provide maturity and personal growth.

28

1    e.    Plaintiff Dowe now is left with the dilemma of being unable to play

2  football after this year, which may leave him financially unable to pursue a four-year

3  degree.

4    f.    Plaintiff Dowe believes that elimination of football programs by

5  MCCDD will impact him financially in the future.

6    39.   Plaintiff Clark:

7    a.    Plaintiff Clark graduated from Moon Valley High School in

8  Phoenix, Arizona, in May 2018.

9    b.    Plaintiff Clark played football all four years at Moon Valley High

10  School and was selected to the All-Section Team as a defensive tackle for three years.

11    c.    Plaintiff Clark accepted a scholarship to and committed to playing

12  football at GCC prior to announcement on February 5, 2017 of the elimination of

13  football programs at MCCCD on February 5, 2018.

14    d.    Plaintiff Clark believes that football provides guidance, mentorship,

15  structure, comradeship, *etc.*, all of which serve provide maturity and personal growth.

16    e.    Plaintiff Clark now is left with the dilemma of being unable to play

17  football after this year, which may leave him financially unable to pursue a four-year

18  degree.

19    f.    Plaintiff Clark believes that elimination of football programs by

20  MCCDD will impact him financially in the future.

21    40.   Plaintiff Nivens:

22    a.    Plaintiff Nivens graduated from Thunderbird High School in

23  Phoenix, Arizona, in May 2018.

24    b.    Plaintiff Nivens played football all four years at Thunderbird High

25  School and was selected to the All-Region Team as a running back.

26    c.    Plaintiff Nivens accepted a scholarship to and committed to playing

27  football at PC prior to announcement on February 5, 2017 of the elimination of football

28  programs at MCCCD on February 5, 2018.

> d.      Plaintiff Nivens believes that football provides guidance, mentorship, structure, comradeship, *etc.*, all of which serve provide maturity and personal growth.

> e.      Plaintiff Nivens now is left with the dilemma of being unable to play football after this year, which may leave him financially unable to pursue a four-year degree.

> f.      Plaintiff Nivens believes that elimination of football programs by MCCDD will impact him financially in the future.

## VI.   BACKGROUND OF DECISION TO TERMINATE FOOTBALL PROGRAMS AT MCCCD COLLEGES

### A.   Establishment of "Maricopa Priorities Athletic Task Force" ("MPATF") in 2012.

41.    The history of the decision to eliminate the football programs at the MCCCD colleges had its genesis in 2012 when then Chancellor Rufus Glasper commissioned Task Forces for each department within the MCCCD.[1]

### B.   MPATF Recommendation That Football Programs Be Eliminated.

42.    After a number of years of evaluation and study, on May 22, 2017, the MPATF issued its recommendation that football programs in the MCCCD colleges be eliminated.[2]

---

[1] As noted in one internet article:

> In 2012 a series of "Task Forces" were commissioned by then-chancellor Rufus Glasper, with each department of the Maricopa County Community College District set to undergo an examination to see how students might be better served. The Maricopa Priorities Athletics Task Force was formed as part of the original 2012 plan, and the result of the research done into how students within the MCCCD system might best be served in the future . . . .

[*See,* Exhibit 1: Ralph Amsden Arizona Varsity article, 2/5/2018 Football; https://arizonavarsity.rivals.com/news/mcccd-to-eliminate-junior-college-football-programs-after-2018-season]

[2] The document entitled "Maricopa Community Colleges Athletics" ("MPATF Report") provides, *inter alia,* as follows:

> **6. Eliminate football teams**
> After a great deal of consideration of quantitative and qualitative data, ***the task force recommends to eliminate football as a MCCCD sponsored sport at all***

43.     On October 12, 2017, Defendant Harper-Marinick issued an email stating that the football programs would *not* be eliminated.[3]

44.     Just four months later on February 5, 2018, the Office of Defendant Harper-Marinick issued a "press release" that football would be eliminated following the upcoming 2018 season as a MCCCD sponsored sport.[4]

45.     The decision did not reference any change in circumstances or otherwise provide an explanation for the sudden reversal.

C.     **MPATF Improperly Utilized Alleged Costs of Football Stadium Improvements.**

---

*colleges that currently field teams: Scottsdale, Phoenix College, Mesa, and Glendale. [Emphasis supplied]*
[3] See, <u>Exhibit 2</u>: Chancellor Harper-Marinick email dated 10/12/2017, which provides, *inter alia*, as follows:
    After thoughtful consideration of both the quantitative and qualitative data in the Maricopa Priorities Athletic Task Force's report, ***I have decided that it is not prudent to eliminate football at this time.*** *[Emphasis supplied]*
    Our core mission is to provide access to higher education and to serve our communities. We will reevaluate the football programs in 2018-2019 based on their progress around student success measures. Our main priority will remain providing a solid educational experience to our students and ensuring their success in the attainment of their career and personal goals.
[4] *See*, <u>Exhibit 3</u>: The press release provides, *inter alia*, as follows:
FOR IMMEDIATE RELEASE
Feb. 5, 2018
        **MCCCD to Eliminate Football Programs following 2018 Season**
TEMPE, Arizona - Maricopa County Community Colleges District (MCCCD) will eliminate football following the upcoming 2018 season as a MCCCD sponsored sport. Ongoing financial constraints, including levelling off of enrollment growth at a majority of the colleges as well as the zeroing out of state support for MCCCD has led to the need for the district to look at the prioritization of resources to ensure we continue to meet the changing educational needs of the community.
    "The decision to eliminate the football programs at Maricopa Community Colleges was not taken lightly. Although this is a disappointment to our student athletes, coaching staff, and football fans, it is ultimately the right decision for the District and the long-term success of students," said Matt Hasson, District communications director. "***As an essential resource to the community and businesses, MCCCD must be responsible for the financial resources it has been entrusted with***." *[Emphasis supplied]*
    In May, 2017, the Maricopa Priorities Athletic Task Force submitted a list of recommendations to District Administration regarding the MCCCD athletic programs. These recommendations focused on student success, effective allocation of resources, and long-term compliance and sustainability. These recommendations, coupled with the elimination of financial investment from the state in community college education, forced very difficult conversations about our ability to serve the growing education needs of our community, especially those for whom access is already a challenge.

46.     As part of its study, the MPATF requested that each athletic department of the four colleges with a football program submit a "wish list" of improvements it would like to see for its football facilities and the costs for the same.

47.     Included within the wish list requested a request for "stadium improvements."

48.     Although the information requested was a wish list, the MPATF improperly utilized the wish list information provided by the athletic departments of the four colleges with a football program.

49.     The MPATF did so by listing the costs of the stadium wish list improvements as costs that were required or necessary.

50.     In so doing, the MPATF substantially exaggerated the costs of the football programs of the four colleges.

51.     The improper utilization of the stadium wish-list costs made to the athletic directors of the colleges with football programs is evidenced by the inability to provide documentation regarding the use of such information in the report and recommendation made by the MPATF.[5]

///

**D.     MPATF Members Scott Geddis, Jeffrey N. Darbut, and Robert Soza Were Not Neutral and Impartial.**

52.     A number of appointed members of the MPATF were not neutral and impartial in participating in the task force and the recommendation ultimately made by the MPATF should have been disregarded as set forth below.

53.     MPATF member Scott Geddis ("Mr. Geddis"), who was involuntarily removed as Athletic Director of Phoenix College, did not act neutrally and impartial in the study undertaken by the MPATF.

54.     Mr. Geddis has made racist remarks against African Americans over the years.[6]

_____

[5] _See_, Exhibit 4: Various emails dated February 2018, from and to John Mulhern, Director of Athletics, Mesa Community College.

-19-

55.    Mr. Geddis' racist remarks about minorities, including African Americans, who compromised a significant number of football players on the PC football team, should have disqualified him from being a member of the MPATF.

56.    The District Athletic Council ("DAC), which is comprised of the Athletic Directors from the various MCCCD colleges, not only questioned Mr. Geddis' addition the MPATF,[7] but also had concerns about his ability to be "transparent in his review and recommendation," and requested that Mr. Geddis' appointment to the committee be reevaluated.[8]

57.    The DAC also was concerned about the letter Mr. Geddis sent regarding Title IX and the PC football program.[9]

---

[6] Examples of Mr. Geddis racist remarks include the following:
   10/2003: Mr. Geddis berated R. Shepro in front of staff and students, and made racial slurs about manufacturers and production companies;
   02/11/04: Staff meeting when speaking on minority representation on teams. "I got one, I went out and got two."
   02/17/04: When Assistant Athletic Director and Coach Patrick Mooney spoke with Mr. Geddis about clarification of diversity training, he became irritated when asked what he wanted from participation in the diversity training, *i.e,*. personal benefit to participant or a report back to group. Mr. Geddis stormed off and stated "I don't care how you learn about THEM, just do it." **(Referring to minorities as them...)**

[7] See, <u>Exhibit 5</u>: John Mulhern, Director of Athletics of Mesa Community College, email dated 09/12/2016, which provides, *inter alia*, as follows:
   A question was asked of me today to receive an answer on the following "***why was a change made on the Maricopa Priorities Recommendations to athletics committee from John Schampel to Scott Geddis***? [*Emphasis supplied*]

[8] See, <u>Exhibit 6</u>: John Mulhern, Director of Athletics of Mesa Community College, email dated 09/12/2016, which provides, *inter alia*, as follows:
   ***As the current District Athletic Council (DAC) chair and as directed by a majority of the DAC athletic directors I write this email to go on record stating the concern of the DAC that Mr. Scott Geddis has been selected as a team member of the Maricopa Priorities Recommendations related to athletics committee.*** For your information three athletic directors did not vote due to conflict of interests. [*Emphasis supplied*]
   ***Based upon discussions at the September DAC meeting it is the belief of the DAC athletic directors that Mr. Geddis will not be transparent in his review and recommendations***. The DAC respectfully recommends that his participation in this committee be evaluated based upon our concerns. ***Also, please see the attached letter that was sent to me regarding Title IX and the football program at Phoenix College with his evaluation and input***. Thank you for your consideration. [*Emphasis supplied*]

[9] See, <u>Exhibit 7</u>: Scott Geddis letter re Title IX, which provides, *inter alia*, as follows:
   **MY INPUT**
   Nearly all schools with football are out of Title IX compliance concerning proportionality. Issues seldom arise until however, until a more obvious issue is

58.     Serving on the MPATF allowed Mr. Geddis a vehicle with which to retaliate against those he viewed as responsible for his removal at Athletic Director at PC.

59.     Based thereon, Mr. Geddis' participation in the MPATF and its ultimate recommendation that the football programs be eliminated also was not neutral and impartial.

///

///

60.     MPATF member Jeffrey N. Darbut, Vice-President of Administrative Services of MCC, also did not act neutrally and impartial in the investigation undertaken by the MPATF.

61.     A prime example of Mr. Darbut's bias against athletics in general is contained within the "Organizational Change at Maricopa Community Colleges, A Position Paper, March 2017" ("Darbut Paper") he authored.

62.     The Darbut Paper recommends elimination of "all" athletic programs.[10]

---

raised such as inequity in fields, coaching salaries, facility access etc. Once that issue is raised a Title IX audit will be conducted and proportionality becomes a serious issue.

It is my opinion that we are out of compliance in two areas proportionality and facility access.

1. Phoenix College enrollment is currently 60% Female, Phoenix College Athletics opportunities are 30% female.  We did not sponsor a women's golf team in 2008-09 for lack of the available coaches willing to take a part time coaching position which lead to a reduction in the number of students recruited.  The elimination of football increases the athletic opportunities at PC to 50% female. In addition it reduces the number of head men's sports coaches by 2.  Currently we have 4 full time head coaches of men's sports and 3 in women's sports.

2. Current access to the equipment room is through the men's locker room.  In the past we have requested budget to remedy this situation and have been denied.  In place we installed a curtain that is a limited solution at best.  With the elimination of football the office currently used by football coaching staff will be converted to an equipment room access for both genders.

It is my understanding that SCC is under some Title IX suspicion related to field upgrades.  Softball was the last on the list after football practice field, baseball field and main football field and the money ran out.  The current Softball coach at SCC is an attorney and I have heard he is raising a Title IX issue.  If true it could spill to other Maricopa schools]

[10] *See,* Exhibit 8: The Darbut Paper provides, *inter alia,* as follows:

-21-

63.    Mr. Darbut has a close ongoing political relationship with Governing Board member, Jean McGrath, who set forth below, authored a number of emails, which were critical of college programs promoting ethnic and racial diversity and inclusiveness.

64.    Based on the foregoing, Mr. Darbut's participation in the MPATF and its ultimate recommendation that the football programs be eliminated was not neutral and impartial.

65.    MPATF member Robert Soza ("Mr. Soza"), Faculty President of MCC did not act neutrally and impartial in the investigation undertaken by the MPATF.

66.    Mr. Soza publicly has stated on various occasions in Faculty Senate Meetings at MCC, as well as to several individuals within the campus community, that he believes athletics have no place on a community college campus.

67.    Based on Mr. Soza's outright bias against athletics in community colleges, his participation in the MPATF and its ultimate recommendation that the football programs be eliminated also was not neutral and impartial.

E.    **Emails Between Defendant Hendrix and Defendant Harper-Marinick Evidence Political and Personal Basis for Decision to Eliminate Football Programs.**

**Cost Reductions that Improve Efficiency**
8. *Eliminate all Athletic programs; this is a quick one with large savings.* [*Emphasis supplied*]
  a.  Annual savings in operating costs are $12.5 million
  b.  The cost per FTSE, excluding Athletic costs is $7,500, while the cost per student athletic adds another $6,400 for a total cost per student athletic of $13,900
  c.  Avoids needed capital improvements estimated at $3.0 to $5.0 million annually
  d.  Eliminates compliance and student athlete safety issues
  e.  Sell athletic land and buildings – generates $25-$75 million cash; alternatively, lease the land to create an on-going revenue stream (this is the ASU model)
  f.  Viewed by many faculty members as not contributing to the college mission.
  g.  There are no Student Outcomes that support the enormous cost of Athletic Programs.
[*See*, Darbut Paper, p. 10.]

68.   Defendant Hendrix instructed Defendant Harper-Marinick to eliminate the football programs at MCCCD colleges for political and personal reasons rather than for any legitimate basis.

69.   This position is corroborated and evident from the exchange of emails between Defendant Hendrix and Defendant Harper-Marinick on October 20, 2017.[11]

70.   As noted in their emails, Defendant Hendrix and Defendant Harper-Marinick were more concerned about the "transformation" of the MCCCD than other issues.

71.   The first email of October 20, 2017, from Defendant Hendrix to Defendant Harper-Marinick provides, *inter alia*, as follows:

> ***As for the resolution, it was my intent to try to have something on each agenda that provides talking points for a few of the members that are making the speaking tour rounds as part of campaigns. If they can focus their talking points on these victories, it will take the focus off of other issues***. ***Ms. McGrath's hot buttons at the moment are*** sabbaticals, travel, union memberships, and ***most recently football***. ***If we give her victories to take to her supporters, it will keep her on board for the bigger agenda, namely the transformation***. The ball that we need to keep our eye on is the transformation. ***This other stuff is window dressing but we need it so that the board members can share their list of victories with their supporters and remain supportive for the bigger picture***. [*Emphasis supplied*]
>
> The meeting went well this morning but the executive session is going to be challenging. ***For the moment, the focus has been diverted away from you but the flip side is that it is being re-directed toward Ms. Cooper***. . . . [*Emphasis supplied*]

[*See*, Exhibit 9.]

72.   In response to the email from Defendant Hendrix, Defendant Harper-Marinick sent her email of October 20, 2017, that provides, *inter alia*, as follows:

> If having sabbaticals and agendas helps, we can do that. Am still working on the union stuff and getting clarity about what we exactly do with "membership" organizations. ***Is she in favor of keeping football or eliminating? It is not prudent to***

---

[11] See, Exhibit 9: Emails between MCCCD Governing Board President Hendrix and Chancellor Harper-Marinick dated 10/20/2017.

*take that one on at this time, my professional and political judgment.* [*Emphasis supplied*]

[*See,* Exhibit 9.]

73.　　Finally, in his reply email of October 20, 2017, Defendant Hendrix stated, *inter alia*, as follows:

> *Football is on her [McGrath's] list but the list is long As long as we pick at the list occasionally, we should be fine. Coincidentally, football is on Gutierrez's list as well.* [*Emphasis supplied*]
> 　　As far as sabbaticals, *I don't want to create unnecessary work but if we keep small victories going, it will be much easier to keep the major issues on track. The transformation is the big item. I'd like to keep as much of the complaining as possible focused in another direction.* So far, that has gone well. [*Emphasis supplied*]

[*See,* Exhibit 9.]

74.　　It is evident that Defendant Hendrix instructed Defendant Harper-Marinick to terminate the football programs at the MCCCD colleges.

F.　　**Emails from Defendant McGrath and Defendant Haver Evidence Political, Personal and Racist Bases Behind the MCCCD Decision to Eliminate Football Programs.**

75.　　Emails of various MCCCD Board Members, including Defendant McGrath and Defendant Haver and others also evidence that the decision to eliminate MCCCD football programs was for political, personal, and racists reasons rather than for any legitimate basis.

76.　　This position is corroborated and evident from the exchange of emails between Defendants McGrath and Haver and others.[12]

77.　　The first email was sent at 8:06 p.m. on June 4, by Defendant McGrath which provides:

> I don't think the taxpayers should be funding activities such as this. I am especially opposed to offering trips to any other than full time students. Note that one of the presenters Is affiliated with CAIR. This does not pass my FAR test, front

---

[12] See, Exhibit 10: Emails between Governing Board Members, Chancellor Harper-Marinick, and others.

-24-

page of the Arizona Republic. I've been told that not all trippers are legal citizens of the U.S.

[*See*, Exhibit 10.]

78.    On October 15, 2017 at 9:33 a.m. Defendant McGrath sent another email which provides:

> ***MCCCD has been spending taxpayer dollars for indoctrination of faculty and students by CAIR*** [Council on American Islamic Relations].

[*See*, Exhibit 10.]

79.    Defendant Haver responded to that email at 12:42 p.m. on that same date as:

> ***My 13-year old grandson has a <u>Muslim</u> teacher for one class. I will ask him how that has worked out when I see him over Thanksgiving. <u>I find it very disconcerting</u>*** . . . [*Emphasis supplied*].

[*See*, Exhibit 10.]

80.    Defendant McGrath followed up with an email at 9:33 a.m. on October 15, 2017:

> . . . I want everyone to be aware that the taxpayers are paying for Dr. Robert Soza's trip called "Cultural Bridges". He takes a large group, sometimes as many as 50, on a 4 night tour during spring break. The first stop on the tour Is a lecture by a GAIR member, Imraan Siddiqi, who talks about Islamophobia. We pay him $250 for the lecture.
>
> I think the Board should start reviewing and approving the purpose or trips such as this. When I tell people how their tax money is being spent, they get very upset.
>
> We do so many good things and could accomplish more If we didn't waste money on liberal causes such as Dr. Soza's trip.

[*See*, Exhibit 10.]

81.    On October 25, 2017, Defendant Haver responded to that email at 3:27 p.m. as follows:

> Jean -You are right about Imraan Siddiqi. ***<u>I object to our funding</u> <u>a guy who is the AZ Director of CAIR</u>*** and has a very hateful website https://hatehurts.net/.  I will check into the other speakers and get back to you. [*Emphasis supplied*].

[*See*, Exhibit 10.]

82.     On October 25, 2017 at 3:43 p.m., Defendant McGrath sent her email reply that provides:

> **We need to convince Mesa CC to stop wasting taxpayer dollars funding Dr. Soza's trip.**[*Emphasis supplied*]

[*See*, Exhibit 10.]

83.     Defendant Haver responded on October 25, 2017 at 3:45 p.m. as follows:

> . . . **Chicano Park is a highly controversial park with murals and anti-Trump stuff. Our students have no business going there. This is a trip to convert students to the ultra-left**. . . . . [*Emphasis supplied*].

[*See*, Exhibit 10.]

84.     On October 26, 2017 at 2:09 p.m. Defendant Haver sent an email that provides:

> Here is a video of Edilberto Flores addressing a group of people on "informative justice:" . . .

> He is one of the speakers scheduled to address 50 students, 5 student leaders, 1 alumni lead, and approximately 4 staff members from Mesa Community College during their trip inappropriately called "Bridging Cultures."

> This is not the only experience the group will have that is politically extreme. The cost of the trip is $15,000, paid by MCC. The other speakers and places visited tend to be very left-leaning - something I do not believe is appropriate at a publicly funded college.

> I am sure others know about this annual trip. Surely parents have learned about it. It may have something to do with the declining enrollment at MCC.

[*See*, Exhibit 10.]

85.     On November 1, 2017 at 2:09 p.m. Defendant McGrath sent an email that provides:

> The Cultural Bridges trip put together each year by Dr. Robert Soza has been Investigated. **_Several Board members are so outraged by the messages delivered on the trip that they plan to vote no on any expenditure that benefits Mesa_**

-26-

*CC*. I suggest that until the Board has been notified that this trip Is cancelled, no requests that benefit MCC be put on the agenda so as not to embarrass them. [*Emphasis supplied*]

[*See*, Exhibit 10.]

86.     Finally, on January 8, 2018 at 2:29 p.m. Defendant McGrath sent an email that provides:

The Cultural Bridges Trip is being advertised al Mesa CC. It is the same program with the District paying for the trip. *Will you please put a stop to this misappropriation of public funds*. [*Emphasis supplied*]

[*See*, Exhibit 10.]

87.     It is evident from the foregoing that various Defendants in their position as Governing Board Members of Defendant MCCCD demonstrated racial, religious, and political animus to topics with which they do not agree.

## FIRST CAUSE OF ACTION

### Exclusion from Participation, Denial of Benefits, and Discrimination Against Plaintiffs on Basis of Race
### (42.U.S.C. § 2000d, *et seq.*)

88.     Plaintiffs reallege and incorporate by reference herein the allegations above contained.

89.     Defendants falsely asserted that one basis for terminating the football programs at MCCCD colleges was that maintain the programs was too costly.

90.     In 2014-2015, football cost Defendant MCCCD $988,715 in direct costs and insurance premiums.

91.     Given the ratio of in-state athletes to out of state athletes, football brought in at least $976,650 in tuition alone, thus the football programs only incurred an annual cost of $12,065 or 1% of Defendant MCCCD's total athletic budget of $12,500,000.

92.     Defendants falsely asserted that another reason to terminate the football programs at MCCCD colleges was that insurance claims are too high.

93.     Defendant MCCCD's responsibility is to pay insurance premiums not insurance claims.

94.   The premiums paid by Defendant MCCCD are the same for all MCCCD athletes.

95.   Football players only account for 18% of Defendant MCCCD's total insurance premium costs.

96.   In high insurance claims, the catastrophic policy covers every athlete of Defendant MCCCD not just football players.

97.   The premium for a football player is the same as the premium for a golfer or other sports.

98.   These premium costs can be averted if Defendant MCCCD made the student athletes responsible for paying the cost of premiums as is done or required in other Community College Districts.

99.   Defendants falsely asserted that another reason to terminate the football programs at MCCCD colleges was that the ongoing cost to maintain football programs could exceed Twenty Million ($20,000,000.00) in needed capital improvements.

100.   Although this assertion was a widely touted by officials of Defendant MCCCD, no study exists that supports the claim that a Twenty Million ($20,000,000.00) capital expenditure is necessary to maintain the football programs by Defendant MCCCD.

101.   Emails between administrators of Defendant MCCCD confirmed that no such study exists.

102.   The number is attributed to a "wish list" by a campus athletic director who requested stadium improvements for all sports, not just football.

103.   None of these improvements were required for the football programs and, if approved, would be implemented whether Defendant MCCCD continued the football programs or not.

104.   The facilities used by football programs(locker rooms, fields, *etc.*) are used by academic programs like Exercise Science as well as, soccer, the community and other sports;

105.   Defendants falsely asserted that another reason to terminate the football programs at MCCCD colleges was due to elimination of funding by the State Legislature as another reason for elimination of football programs.

106.   This is not a new development as state funding of Arizona community colleges ended four years ago.

107.   Defendants falsely asserted that another reason to terminate the football programs at MCCCD colleges was the low academic achievement of football players.

108.   The assertion that MCCCD college players exhibit poor academic performance is refuted by the fact that in academic year 2014-2015, the year studied by the MPATF Report.

109.   The GPA for MCCCD athletes was 2.99, which was higher than non-athletes.

110.   Football players attained 74% course success rate as compared to a 75% course success rate for the entire student population. Soccer (majority non-minority) programs reported only at a 72% student success rate. [*See*, MPATF Report at page 7.]

111.   Low Fall to Fall Retention Rates for football players do not take into consideration that many football players leave the Community College early to accept scholarship or transfer to 4-year institutions. Soccer (majority non-minority) programs reported a 48% fall-to-fall retention rate the lowest of all MCCCD athletic programs. [See, MPATF Report at page 7.]

112.   Defendants falsely asserted that another reason to terminate the football programs at MCCCD colleges was that the student loan default rates are higher amount MCCCD football players.

113.   The default rate (35%) of football players is slightly higher than the overall MCCCD average of 31%; however, since football players make up only 0.04% of MCCCD's FTE's, the difference does not negatively affect the MCCCD's loan default rating.

114.    Men and Women's Basketball players reported a 53% student loan default rates. [*See*, MPATF Report at page 7.]

115.    The evidence does not support the justification for the Defendant MCCCD decision to eliminate football programs and is, therefore, not legitimate and evidences a violation. (*See Elston*, *supra*, 997 F.2d at 140).

116.    In the 2018-2019 Academic year, 219 out of the 358 football players or 62% enrolled at these MCCCD's four campuses or 62% are African-American and 139 or 38% are White.

117.    In 2017, 3,787 African-American students and 25,762 White students attended these four colleges.

118.    The elimination of the football programs on these campuses will negatively affect 5.8%or (219 out of 3,797) African-American students as opposed to .5% (139 out of 25,796) of the White students.

119.    Due to the decision to terminate the football programs, African-American students including Plaintiffs Juniel, Duhart, Boudy, Jordan, Maddox, Glover, Davison, Wilbon, Adams, Dowe, and Clark, and Nivens, will be denied educational opportunities at a rate over 10 times the rate of White students.

120.    A disparity is established if the challenged practice adversely affects a significantly higher proportion of protected class members than non-protected class members. *Tsombanidis v. W. Haven Fire Dept.*, 352 F.3d 565, 576-77 (2nd Cir. 2003).

121.    A much higher percentage of African-American students, including Plaintiffs Juniel, Duhart, Boudy, Jordan, Maddox, Glover, Davison, Wilbon, Adams, Dowe, and Clark, and Nivens, will be negatively affected and denied the opportunity to continue their college education and opportunities if the football programs are eliminated.

122.    In order to establish a "substantial legitimate justification .. ", courts have required that recipients of federal funds, like Defendant MCCCD, show that the challenged decision, resulting in such a negative impact, was necessary to meeting a goal

that was legitimate, important and integral to the [recipients'] institutional mission. *Elston v. Tallageda City Board of Education*, 997 F.2d 1394, 1415 (11th Cir. 1993). The MCCCD cannot meet that burden.

123.   Title VI requires recipients to implement a "less discriminatory alternative" if it is feasible and meets their legitimate objectives. *Elston*, *supra*, 997 F.2d at 1407, 1413; *Georgia State Conference of Branches of NAACP v. State of Georgia*, 775 F.2d 1403 at 1417 (11th Cir. 1985).

124.   Defendant MCCCD has not established a substantial legitimate justification for its decision that had such a discriminatory impact, many less discriminatory alternatives are available.

125.   If, in fact, costs were an actual factor, many booster groups have expressed an interest in fund raising.

126.   External partnerships and facility rentals can generate additional resources.

127.   Insurance costs can be dramatically reduced if Defendant MCCCD, like many other college athletic programs, required student athletes to pay for the individual costs for their own issues of insurance premium.

128.   Defendant MCCCD failed or refused to consider less discriminatory alternatives.

129.   Plaintiffs Juniel, Duhart, Boudy, Jordan, Maddox, Glover, Davison, Wilbon, Adams, Dowe, and Clark, and Nivens all belong to a protected class, African-American.

130.   Plaintiffs Juniel, Duhart, Boudy, Jordan, Maddox, Glover, Davison, Wilbon, Adams, Dowe, and Clark, and Nivens have protected right to be free from discrimination under the Civil Rights Act of 1964, Title 42 United States Code 2000d.

131.   Defendant MCCCD is the recipient of federal financial assistance as provided for in 42 U.S.C. § 2000d.

132.   By receiving such federal financial assistance Defendant MCCCD is obligated to comply with all requirements of the 42 U.S.C. § 2000d *et seq*.

133.   Defendants decision to eliminate the football programs at all MCCCD colleges constitutes an intentional exclusion from participation, denial of benefits, and discrimination against Plaintiffs Juniel, Duhart, Boudy, Jordan, Maddox, Glover, Davison, Wilbon, Adams, Dowe, and Clark, and Nivens solely on the basis of their race as African-Americans.

134.   Defendants decision to eliminate the football programs at all MCCCD colleges evidences a policy and practice, both written and unwritten, of racial discrimination.

135.   Defendants and each of them participated in the discrimination against Plaintiffs Juniel, Duhart, Boudy, Jordan, Maddox, Glover, Davison, Wilbon, Adams, Dowe, and Clark, and Nivens and have cultivated a culture where discrimination has become the norm.

136.   As a direct and proximate result of Defendants' intentional actions and disregard for Plaintiffs' rights to be free from discriminatory conduct based on race, Plaintiffs Juniel, Duhart, Boudy, Jordan, Maddox, Glover, Davison, Wilbon, Adams, Dowe, and Clark, and Nivens have suffered damages including the indignity of discrimination, severe anxiety about their future, all resulting in disruption of their personal lives and loss of enjoyment of ordinary pleasures of life.

137.   As a direct and proximate result of the intentional conduct of Defendants and each of them, Plaintiffs Juniel, Duhart, Boudy, Jordan, Maddox, Glover, Davison, Wilbon, Adams, Dowe, and Clark, and Nivens have suffered injury and will continue to suffer injury.

## SECOND CAUSE OF ACTION

**Violation of Plaintiffs' Rights to Equal Protection**
**(14th Amendment to United States Constitution; 42 U.S.C. § 1983)**

138.   Plaintiffs reallege and incorporate by reference herein the allegations above contained.

-32-

139.   Plaintiffs Juniel, Duhart, Boudy, Jordan, Maddox, Glover, Davison, Wilbon, Adams, Dowe, ~~and~~ Clark, and Nivens all belong to a protected class, African-American.

140.   For the reasons stated above, Defendants decision was based on political, personal and racist views or opinions as evidenced by the email exchanges between various Defendant MCCCD Board Members and non-board members as noted above, including Defendant Hendrix, Defendant McGrath, and Defendant Haver.

141.   The various Defendants, including Defendant Board Members Hendrix, McGrath, and Haver, as well as Defendant Harper-Marinick, through their conduct exhibited discriminatory treatment of Plaintiffs Juniel, Duhart, Boudy, Jordan, Maddox, Glover, Davison, Wilbon, Adams, Dowe, ~~and~~ Clark, and Nivens as set forth above.

142.   The various Defendants, including Defendant Board Members Hendrix, McGrath, and Haver, as well as Defendant Harper-Marinick, through their conduct failed to take action to prevent the discriminatory conduct set forth above.

143.   The various Defendants, including Defendant Board Members Hendrix, McGrath, and Haver, as well as Defendant Harper-Marinick, through their conduct gave rise to a policy that tolerates discriminatory conduct set forth above.

144.   The various Defendants, including Defendant Board Members Hendrix, McGrath, and Haver, as well as Defendant Harper-Marinick, through their conduct condoned and allowed the discriminatory conduct described above to become institutionalized and condoned.

145.   Defendants' decision to eliminate the football programs at all MCCCD colleges violates Plaintiffs Juniel, Duhart, Boudy, Jordan, Maddox, Glover, Davison, Wilbon, Adams, Dowe, Clark, and ~~Clark's~~ Nivens' substantive due process rights to equal protection under the Fourteenth Amendment to the United States Constitution.

146.   Defendants decision to eliminate the football programs at all MCCCD colleges constitutes an intentional exclusion from participation, denial of benefits, and discrimination against Plaintiffs Juniel, Duhart, Boudy, Jordan, Maddox, Glover,

Davison, Wilbon, Adams, Dowe, ~~and~~ Clark, and Nivens solely on the basis of their race as African-Americans.

///

147.   Defendants decision to eliminate the football programs at all MCCCD colleges evidences a policy and practice, both written and unwritten, of racial discrimination.

148.   Defendants and each of them participated in the discrimination against Plaintiffs Juniel, Duhart, Boudy, Jordan, Maddox, Glover, Davison, Wilbon, Adams, Dowe, ~~and~~ Clark, and Nivens and have cultivated a culture where discrimination has become the norm.

149.   As a direct and proximate result of Defendants' actions and disregard for Plaintiffs' rights to be free from discriminatory conduct based on race, Plaintiffs Juniel, Duhart, Boudy, Jordan, Maddox, Glover, Davison, Wilbon, Adams, Dowe, ~~and~~ Clark, and Nivens have suffered damages including the indignity of discrimination, severe anxiety about their future, all resulting in disruption of their personal lives and loss of enjoyment of ordinary pleasures of life.

150.   As a direct and proximate result of the conduct of Defendants and each of them, Plaintiffs Juniel, Duhart, Boudy, Jordan, Maddox, Glover, Davison, Wilbon, Adams, Dowe, ~~and~~ Clark, and Nivens have suffered injury and will continue to suffer injury.

## THIRD CAUSE OF ACTION

## DECLARATORY JUDGMENT
### (28 U.S.C. § 2201)

151.   Plaintiffs reallege and incorporate by reference herein the allegations above.

152.   Plaintiffs seek declaratory relief as provided in 28 U.S.C. § 2201, *et seq.*

## PRAYER FOR RELIEF

1  **WHEREFORE,** Plaintiffs Juniel, Duhart, Boudy, Jordan, Maddox, Glover,
2  Davison, Wilbon, Adams, Dowe, ~~and~~ Clark, and Nivens pray for judgment against
3  defendants as follows:

4  A.   That this court declare the actions complained of herein to be in violation
5  of the Civil Rights Act of 1964, Title 42 United States Code 2000d.

6  ///

7  ///

8  B.   That this court declare the actions complained of herein to be in violation
9  of the Civil Rights Act of 1871, Title 42 United States Code Section 1983 and the 14th
10  Amendment to the United States Constitution.

11  C.   That the defendants be ordered to take appropriate injunctive and
12  affirmative acts to insure that the actions complained of herein are not engaged in by
13  them or any of their agents.

14  D.   That the defendants be permanently enjoined from engaging in any action
15  that harms African-American football players and, in particular, be enjoined from
16  eliminating the football programs at MCCCD colleges.

17  E.   That Plaintiffs be awarded their attorney's fees.

18  F.   That Plaintiffs be awarded their costs.

19  G.   That Plaintiffs be awarded all other relief that this court deems just and
20  proper under the circumstances.

21  **DATED** this ———— 25th day of ~~December, 2018~~February, 2019.

22  /s/    Phillip A. Austin
23  ————————————————
    PHILLIP A. AUSTIN
    Counsel for Plaintiffs
24

25  **DATED** this ———— 25th day of ~~December, 2018~~February, 2019.

26  /s/    Richard M. Martinez
27  ————————————————
    RICHARD M. MARTINEZ
    Counsel for Plaintiffs
28